IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

WELCH ALLYN, INC.,

                Plaintiff,               Civil Action No.
                                         5:14-CV-1122 (TJM/DEP)
     v.                             LEAD CASE

OBP CORPORATION and OBP
MEDICAL INC.,

                Defendants.

_____

WELCH ALLYN, INC.,

                Plaintiff,               Civil Action No.
                                         5:16-CV-0538 (TJM/DEP)
     v.                             MEMBER CASE

OBP CORPORATION and OBP
MEDICAL INC.,

                Defendants.

_____

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

BARCLAY DAMON, LLP           DOUGLAS J. NASH, ESQ.
Barclay Damon Tower            JASON S. NARDIELLO, ESQ.
125 East Jefferson Street        BELLA S. SATRA, ESQ.
Syracuse, NY 13202             JOHN D. COOK, ESQ.

FOR DEFENDANTS:

COWAN, LIEBOWTIZ            J. CHRISTOPHER JENSEN, ESQ.
& LATMAN, P.C.             MARK MONTAGUE, ESQ.
114 West 46th Street
New York, NY 10036


LURIE FRIEDMAN LLP         DAVID E. LURIE, ESQ.
One McKinley Square        ELIZABETH PAGE WILKINS, ESQ.
Boston, MA 02190

HANCOCK ESTABROOK, LLP     ASHLEY D. HAYES, ESQ.
1500 AXA Tower I           JAMES P. YOUNGS, ESQ.
100 Madison Street
Syracuse, NY 13202


DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

These two consolidated actions involve plaintiff Welch Allyn, Inc.

("Welch Allyn"), and defendants OBP Corporation and OBP Medical Inc.

(collectively "OBP"), three companies that are engaged in the manufacture

and marketing of medical products. Having previously sued OBP for

infringement involving a patent disclosing an innovative vaginal speculum

apparatus, Welch Allyn has again filed suit against OBP alleging

infringement of a subsequently issued, related patent involving a similar product.[1]

Despite their best efforts, the parties have been unable to agree on the proper construction of several terms included within the patent claims asserted by Welch Allyn. The question of claim construction has been referred to me for the issuance of a report and recommendation. Based upon the parties' written submissions and a claim construction hearing conducted by the court, the following report sets forth my recommendations concerning the contested claim terms.

I.    BACKGROUND

The infringement claims asserted in *Welch Allyn II* concern the '898 Patent, which is entitled "Vaginal Speculum Apparatus" and was issued on May 10, 2016 to nine inventors, who, in turn, have assigned the patent to Welch Allyn.[2] *Welch Allyn II*, No. 16-CV-0538, Dkt. No. 1-1 at 1. The

---

[1]    The first of these consolidated actions brought by Welch Allyn against OBP involved Patent No. 8,435,175 ("'175 Patent"). *Welch Allyn, Inc. v. OBP Corp.* ("*Welch Allyn I*"), No. 14-CV-1122 (N.D.N.Y. filed Sept. 12, 2014). Later, in 2016, Welch Allyn commenced the member action against OBP alleging infringement of Patent No. 9,332,898 ("'898 Patent"). *Welch Allyn, Inc. v. OBP Corp.* ("*Welch Allyn II*"), No. 16-CV-0538 (N.D.N.Y. filed May 10, 2016). Shortly after *Welch Allyn II* was filed, Senior District Judge Thomas J. McAvoy consolidated the two actions and identified *Welch Allyn I* as the lead case. Dkt. No. 105. Unless otherwise specified, all citations to the record in this report are to the lead case, *Welch Allyn II*.

[2]    The '898 Patent appears in the record at several different points, including as an

patent discloses advancements in the design of a vaginal speculum, a device commonly known and used "in the field of diagnostic medicine for purposes of examining the cervix of a female patient." '898 Patent, 1:28-30. Both the '898 Patent and the '175 Patent, which is directed to the same general invention, emanate from U.S. Patent Application No. 11/910, 387, filed on April 3, 2006.[3] '175 Patent at 1; '898 Patent at 1; *see also* '898 Patent, 1:6-15. The similarities between the two patents are readily apparent, and both share the same specification.

A vaginal speculum is typically comprised of an upper and lower blade member that are operated upon to open and close by means of an articulation mechanism in order to dilate the vaginal cavity of a patient. '898 Patent, 1:30-34. To enhance the effectiveness of a vaginal speculum, a light source is sometimes utilized in conjunction with the device to illuminate the area being examined. *Id.* at 1:35-52. Historically, that illumination was provided by means of a small light source such as a

---

attachment to Welch Allyn's complaint in the member case. *See, e.g., Welch Allyn II*, No. 16-CV-0538, Dkt. No. 1-1.

[3]    OBP disputes Welch Allyn's claim that the '898 Patent application, U.S. Patent Application No. 14/169,850, was a continuation of No. 11/910,387, claiming that it represented only a continuation-in-part of that application. Dkt. No. 111 at 14. Welch Allyn's alleged misrepresentation to the Patent and Trademark Office ("PTO") examiner that the application contained no new matter forms the basis for OBP's inequitable conduct defense and counterclaim. *Id.* at 6-25.

halogen or other miniature incandescent lamp. *Id.* at 1:38-43. A
representative speculum designed in accordance with the prior art is
depicted in Figure 1, set forth below:



**FIG.1**
Prior Art

'898 Patent, Fig. 1. Figure 1 reflects an apparatus **100** that includes a
disposable speculum **102** and a reusable light assembly **140**. '898 Patent,
6:60-62. The speculum **102** is comprised of three interconnected
components, including a lower blade member **104**, an upper blade
member **108**, and a slide member **112**. *Id.* at 6:62-65. A handle portion
**120** extends vertically downward from the proximal, or rear, end of the
lower blade member **104**, and is integrally molded to the lower blade
member. *Id.* at 7:3-6. An intermediate portion of the slide member **112** is
fitted within a guide slot provided on a rearward facing side of the handle

portion **120**, with the slide member further having a forked upper end or

yoke **124** that receives the upper blade member **108** and is pivotally

attached thereto, including a downwardly extending lever portion **128**

extending from the proximal end of blade member.[4] *Id.* at 7-13. The

handle portion of **120** of the disposable speculum **100** includes a receiving

cavity **133** that is sized for receiving a housing **144** of a reusable

illumination assembly **140**. *Id.* at 7:40-43. The housing **144** retains a

miniature incandescent lamp, such as a halogen bulb, which is sealingly

retained within a distal portion **148** thereof. *Id.* 7:43-45.

      The invention disclosed in the '898 Patent was intended to overcome

several deficiencies associated with the prior art described above. Some

earlier specula, for example, made use of a corded light assembly, thereby

eliminating or reducing the portability of the device and making it more

difficult to examine patients, particularly those who were bedridden and/or

in remote locations. '898 Patent, 2:17-29. In addition, the light sources

typically found in earlier specula created "hot spots" and produced a

reflection of light back into the eye of the user, causing a glare and

impairing the effectiveness of the examination. *Id.* at 1:53-59. Light

---

[4]    The lever portion **128** includes an opening **135**, which is not shown in Figure 1, defining an aperture for use by the examiner, situated between the yoke **124** and the lower and upper blade members **104**, **108**. '898 Patent, 7:14-16.

sources in certain earlier specula also were situated in such a way as to obstruct the view of the user. *Id.* at 1:64-66. Moreover, bodily fluids expelled during the examination were often trapped by the light source, causing contamination and buildup against the light-emitting surface of the light pipe and reducing the effectiveness of the examination. *Id.* at 2:11-16.

The shortcomings associated with prior art specula were addressed by the '898 Patent inventors, who devised a potentially disposable instrument that utilizes a portable cartridge, including an LED light source and batteries, than can be releasably attached to the speculum and can be located in either the upper or lower blade. '898 Patent, 2:42-55. The illumination cartridge can be removable and can either be turned on automatically when inserted into one of the speculum blades, or instead activated through use of a switch or other similar mechanism. *Id.* at 3:56 – 4:5. In addition, the inventors conceived of including a removable light pipe or prism for use in transmitting light from the LED source to the examination area. *Id.* at 3:31-32, 5:3-4

A representative embodiment of the invention disclosed in the '898 Patent is depicted in Figure 35, set forth below:



**FIG.35**

In this embodiment, an illumination assembly **504** comprising a compact
housing **508** is disposed within the top blade **512** of the speculum **510** in a
manner such that the light source, LED or otherwise, is aligned along the
longitudinal axis of the top blade **512**. '898 Patent, 22:60-66. The
speculum includes an upper blade **512** and a lower blade **516**, the latter of
which includes a downwardly depending handle portion **520**. *Id.* at 22:66 –
23:2. An articulation mechanism **524** is included, consisting of a lever
portion **528** extending from a proximal end **530** of the top blade **512** and is
engageable with teeth provided on a flexible projection **532** extending
outwardly from the lower portion of a yoke **534** of a slide member **538**. *Id.*
at 23:2-7. A patient is dilated for purposes of this embodiment by use of a
lower tongue **542** that enables adjustable movement of the slide member
**538** along the exterior of the handle portion **520**, in turn permitting relative

movement between the blades **512**, **516**. *Id.* at 23:7-10. In this embodiment, the housing **508** can be reusable or expendable, and contains at least one battery and necessary circuitry for powering the LED. *Id.* at 23:10-13. While the housing **508** is releasably attached to the top blade **512** in this embodiment, it can alternatively be positioned relative to either the top blade **512** or the lower blade **516** of the speculum **510**. *Id.* at 12-17.

Although not specifically explained in the '898 Patent specification, there does not appear to be any controversy over the fact that the end where the upper and lower blades open is referred to as the distal end and the opposite end of the speculum – that which is closest to the clinician using the speculum – is known as the proximal end. *See, e.g.,* '898 Patent 7:3-4 (explaining that the handle extends downward "from the proximal or rear end of the lower blade member").

II.    <u>PROCEDURAL HISTORY</u>

Welch Allyn commenced *Welch Allyn II* on May 10, 2016. Dkt. No. 1. It contends that OBP has infringed at least claims 1-10, 16-22, and 23-30 (the "asserted claims") of the '898 Patent by making, using, selling, offering for sale, and/or importing vaginal speculum apparatuses, including, though not limited to, OBP's ER-SPEC model and kits including

such vaginal specula. *Id.* at 3; Dkt. No. 119 at 11. As was mentioned above, following its inception, *Welch Allyn II* was consolidated together with *Welch Allyn I*, the latter of which has been designated as the lead action. Dkt. No. 105. OBP has since answered plaintiff's complaint in *Welch Allyn II*, denying plaintiff's allegations; asserting various affirmative defenses, including, *inter alia*, patent invalidity, inequitable conduct, and estoppel; and counterclaiming seeking declarations of unenforceability and invalidity. *See generally* Dkt. No. 111.

In accordance with the court's local patent rules, the parties have conferred and submitted a joint claim construction statement revealing their disagreement concerning several claim terms contained within the '898 Patent. Dkt. No. 115. The issue of claim construction has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). In accordance with that referral, a claim construction hearing was conducted on May 22, 2017. Text Minute Entry Dated May 22, 2015. At the conclusion of that hearing, I reserved decision and indicated that I would provide a written report and recommendation to Senior District Judge Thomas J. McAvoy concerning the issue of claim construction. *Id.*

III.    DISCUSSION

A.    Claim Construction: The Legal Framework

Patent claim construction presents an issue of law, to be decided by the court. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1329 (Fed. Cir. 2012); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*); *see also Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases."). "Claim construction is a legal statement of the scope of the patent right; it does not turn on witness credibility, but on the content of the patent documents." *Lighting Ballast Control, LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1284 (Fed. Cir. 2014) (*en banc*).

As a general rule, a court tasked with construing a patent must assign claim terms their ordinary and customary meanings, as understood by a person of ordinary skill in the art ("POSIA") when read in the context of the patent specification and prosecution history.[5] *Butamax(TM)*

_____

[5]    The parties in this case have not addressed the attributes of a POSIA in *Welch Allyn II*. In a declaration submitted in connection with claim construction in *Welch Allyn I*, employee Scott G. Spanfelner offered the following observation with regard to a POSIA:

*Advanced Biofuels LLC v. Gevo, Inc.*, 746 F.3d 1302, 1308-09 (Fed. Cir. 2014); *Thorner v. SONY Computer Entm't Am., LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313; *accord, Thorner*, 669 F.3d 1365; *see also CCS Fitness, Inc. v. Brunswick Corp.*,

---

> The art involved in the '175 Patent is the design, manufacture or utilization of vaginal specula, which involve mechanical, electrical and optical elements. Given the different technical disciplines involved, the design of vaginal specula is an interdisciplinary and collaborative effort. The scope of knowledge and skills available to persons of ordinary skill working in this art at the time of the invention at issue in this case would have included, in addition to their own educational background and training, working knowledge about the types of uses made of vaginal specula by physicians, obstetricians, gynecologists, and other medical practitioners. Thus, persons having ordinary skill in the art at the time of the invention would have included engineers working collaboratively and having among them at least a bachelor's degree in biomedical, technical, mechanical, optical and/or electrical engineering, several years of experience in designing, testing or manufacturing diagnostic medical devices, and several years of experience working in the healthcare industry.

Dkt. No. 39-2 at 2. OBP's expert, Carl Leinsing, countered by opining that, "[i]n [his] opinion one of ordinary skill in the art in 2005 would be an individual with a bachelor's degree in mechanical engineering or equivalent technical degree and at least 5 years of experience in the medical device field." Dkt. No. 38 at 17. I do not deem it necessary to define a POSIA in order to construe the claim terms now at issue.

288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

There are two exceptions to this general rule. The first involves a circumstance in which a patentee has acted as its own lexicographer, setting out a definition of a term that differs from its ordinary and customary meaning. *Butamax(TM)*, 746 F.3d at 1309; *Thorner*, 669 F.3d at 1365. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner*, 669 F.3d at 1365 (quoting *CCS Fitness, Inc.*, 288 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. Under the second exception, a claim term may also properly be given a meaning that differs from its customary meaning "'when the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Butamax(TM)*, 746 F.3d at 1309 (quoting *Thorner*, 669 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. These two exceptions to the rule that patent terms should be given their ordinary meaning are both narrow and exacting. *Thorner*, 669 F.3d at 1366-67.

While the words of a patent claim will generally control, they should not be interpreted in isolation; "the person of ordinary skill in the art is

deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. A patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. In this respect, a patent specification, which some liken to an internal dictionary, must be carefully reviewed to determine whether, for example, the inventor has used a particular term in a manner inconsistent with its ordinary meaning. *Id.* When resorting to a patent's specification for guidance with respect to disputed claim terms, a court must consider it as a whole, and where possible, all portions should be read in a manner that renders the patent internally consistent. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

Although the language of a patent specification can provide important clues regarding the proper construction to be accorded to a claim term, there are limitations upon its usefulness. "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original). "Nor should particular

embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment." *Cornell Univ. v. Hewlett-Packard Co.*, 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004) (Mordue, J.) (citing, *inter alia*, *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

In addition to the ordinary meaning of a claim term itself and the patent's specification, the prosecution history related to the patent in issue can help inform the determination of a proper claim term construction. *Phillips*, 415 F.3d at 1314. That history is generally comprised of "the complete record of proceedings before the PTO, including any express representations made by the applicant regarding the intended scope of the claims," and an examination of any relevant prior art. *Vitronics*, 90 F.3d at 1582-83. Such evidence, which typically chronicles the dialogue between the inventor and the PTO leading up to the issuance of a patent, and thus can act as a reliable indicator of any limitations or concessions on the part of the applicant, oftentimes proves highly instructive on the issue of claim construction. *See Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower

than it would otherwise be.").

B.    Claim Construction Analysis

In their joint claim construction statement, the parties have identified

the following disputed claim terms:

| Term/Phrase | Claims Implicated |
|---|---|
| the housing extends along the inner surface of the curved portion | 1 |
| the proximal end of the housing is disposed along the inner surface of the curved portion of the lower blade/a proximal end of the housing is disposed along the inner surface of the curved portion | 8, 20, and 23 |
| the housing of the portable illumination assembly being attached to the inner surface of the curved portion of the lower blade and shaped in accordance with the curved portion/the housing of the portable illumination assembly is attached to the inner surface of the curved portion of the lower blade and shaped in accordance therewith/defined by a shape that conforms with the curved portion | 16, 19, and 23 |
| retained | 1, 16, and 23 |
| a switch disposed on the exterior of the housing | 3 |
| at least one of the speculum and the illumination assembly is configured for at least one of single use or single  patient use circuity | 6 |
| circuitry | 7 |

Dkt. No. 115 at 6-16.

Of the asserted claims in this action, those containing disputed terms

are set forth below (with the disputed terms in bold text) in order to provide

context for the claim construction analysis that follows:

**1.** A system for providing illumination to a vaginal speculum, the system comprising:
a portable illumination assembly comprising:
a portable power source; and
at least one LED, each of the portable power source and at least one LED being **retained** within a common housing; and
the speculum comprising:
an upper blade;
a lower blade having a distal end, an opposing proximal end, an inner surface, a handle portion downwardly extending from and part of the proximal end of the lower blade, and a trough-shaped blade portion having a curved portion extending to the downwardly extending handle portion and;
an articulation mechanism disposed at a proximal end of the speculum for permitting relative movement between the upper blade and the lower blade to enable dilation of a patient, the articulation mechanism including a yoke extending from the lower blade, the portable illumination assembly being attached to the lower blade, and wherein the **housing extends along the inner surface of the curved portion.**

**3**. The system as recited in claim **2,** wherein the mechanism for selectively energizing the at least one LED comprises **a switch disposed on the exterior of the housing**.

**6.** The system as cited in claim **1**, in which **at least one of the speculum and the illumination assembly is configured for at least one of single use or single patient use.**

**7.** The system as recited in claim **1**, wherein the common housing of the illumination assembly further retains **circuitry** enabling the at least one LED to be energized by the portable power source.

**8.** The system as recited in claim **1**, wherein **the proximal end of the housing is disposed along the inner surface of the curved portion of the lower blade.**

**16.** A vaginal speculum apparatus comprising:
a portable illumination assembly comprising:
    a housing;
    a portable power source;
    at least one LED, each of the portable power source and the at least one LED being commonly retained within the housing; and
a vaginal speculum comprising:
    an upper blade; and
    a lower blade, each of the upper blade and the lower blade having a distal end, an opposing proximal end, and an inner surface, the lower blade further having a handle portion downwardly extending from and part of the proximal end of the lower blade and a trough-shaped blade portion, where in a curved portion of the trough-shaped blade portion extends to the downwardly extending handle portion; and
    a mechanism for permitting relative movement between the upper blade and the lower blade to enable dilation of a patient, the movement mechanism including a lever portion downwardly extending from the proximal end of the lower blade, each of

the lever portion and the yoke defining a rear opening of the speculum, **the housing of the portable illumination assembly being attached to the inner surface of the curved portion of the lower blade and shaped in accordance with the curved portion**.

19. The apparatus as recited in claim **16**, in which **the housing of the portable illumination assembly is attached to the inner surface of the curved portion of the lower blade and shaped in accordance therewith**.

20. The apparatus as recited in claim **16**, wherein **the proximal end of the housing is disposed along the inner surface of the curved portion of the lower blade**.

23. A vaginal speculum apparatus comprising:
an illumination assembly comprising:
a portable power source; and
at least one LED **retained** within a common housing;
an upper blade;
a lower blade, each of the upper and lower blades having a distal end, an opposing proximal end, and an inner surface, the lower blade further having a trough-shaped blade portion and a handle portion downwardly extending from a part of the proximal end of the lower blade, where in a curved portion of the trough-shaped blade portion extends to the downwardly extending handle portion; and
an articulation mechanism disposed at a proximal end of the speculum for permitting relative movement between the upper blade and the lower blade to enable dilation of the patient, the articulation mechanism including a yoke extending from the lower blade, the yoke forming

> a first viewing aperture defined at the rear of the speculum and the lever portion forming a second viewing aperture, the common housing of the portable illumination assembly being attached to the inner surface of the lower blade, **wherein a proximal end of the housing is disposed along the inner surface of the curved portion** and is **defined by a shape that conforms with the curved portion.**

The parties have agreed that the term "illumination assembly," which appears in Claims 6, 7, 23, and 24 of the '898 Patent, refers to the "portable illumination assembly" construed by the court in the context of the '175 Patent. Dkt. No. 119 at 11 n.1. That term will therefore be defined to mean "a self-contained illumination assembly that can be easily moved from place-to-place." Dkt. No. 90 at 59. The parties also agree that the terms "mechanism for energizing" and "mechanism for selectively energizing," appearing in Claim 17 of the '175 Patent and Claims 2, 3, 24 and 25 of the '898 Patent, respectively, relate to the term "mechanism for energizing" in the context of the '175 Patent. Dkt. No. 119 at 11 n.1. Those terms will therefore be construed to mean

> a slider switch with a conductive strip; a rotary switch with a conductive strip; an optical switch; a magnetic/reed switch; an ON/OFF throw switch that can be enabled with the speculum when engaged therewith to automatically or manually energize and de-energize the LED; and equivalents of the foregoing switches[.]

*Id.* at 59.

### 1.    The housing extends along the inner surface of the curved portion

Among the limitations set forth in Claim 1 of the '898 Patent is "the portable illumination assembly being attached to the lower blade, and wherein the housing extends along the inner surface of the curved portion." '898 Patent, 29:67 – 30:1-2. The parties have requested guidance regarding the second portion of this limitation and have counter-proposed the following constructions for this first term:

| Welch Allyn | OBP |
|---|---|
| at least a portion of the housing is positioned along the portion of the inner surface of the lower blade that is curved | the housing is continuously in line with the inner surface of the curved portion |

At the outset I note, as OBP has pointed out, that there are multiple curved surfaces on a typical vaginal speculum. Dkt. No. 120 at 16. The parties agree, however, that the curved portion, as recited in Claim 1, refers to the part of the speculum extending downward from the lower blade to the handle.

The controversy over this term presents two distinct issues, including whether (1) the housing must be perfectly parallel at all points to the curved portion of the lower blade, and (2) the housing may extend beyond

the curved portion of the lower blade.[6]

According to OBP, the process of answering the two questions presented is complicated by the fact that none of the embodiments reflected in the '898 Patent reveals a housing that follows the curve of the lower blade. Welch Allyn counters that Figure 24, depicted below, supports its position.



FIG.24

_____

[6]     It could be said that this claim term presents a third issue – whether the housing must touch, or be in contact with, the curved portion of the lower blade. Neither party has taken a position regarding this issue. I note, moreover, that independent Claim 16 and dependent Claim 19 both include a limitation describing the housing of the portable illumination assembly as attached to the inner surface of the curved portion of the lower blade. '898 Patent, 31:24-29, 34-38. Whether under the principal of claim differentiation or otherwise, it is readily apparent that that the inventors knew how to articulate the concept of attachment but did not include it in Claim 1. I have therefore not included in my proposed construction of this claim term a provision that would address this issue.

At first blush, the housing **850** shown in Figure 24 appears to be located wholly within the handle, and ends before the curved portion of the lower blade begins. Welch Allyn argues that the light source **854** should be considered as part of the illumination assembly **804** because the description of Figure 24 provides that "[t]he housing **850** retains a portable power supply (not shown), such as at least one battery, and resident circuity (not shown) for powering a contained light source **854**, such as a white LED." '898 Patent 25:4-7. The light source **854** is described as being "disposed above the hollow the handle portion **816** and more specifically at the proximal end of the trough-shaped lower blade **812**[.]" *Id.* at 25:7-10. Implying that the light source **854** is a part of the housing, the specification continues that "[t]he light source **854** is coupled to the *remainder* of the housing **850** by a set of lead wires and electrical contacts **860**[.]" *Id.* at 25:12-14 (emphasis added). Accordingly, I disagree with OBP that no embodiment reflects that the housing follows the curve of the lower blade.

The specification provides little guidance, however, with regard to the issue of whether the portable illumination assembly must follow the shape of the inner surface of the curved portion of the lower blade in its entirety, or instead merely partly. As OBP notes, the prosecution file history associated with the '898 Patent demonstrates that the inventors

knew how to express the concept of "at least a portion" of something extending because the original dependent Claims 6, 12, and 20 claimed "at least a portion of the housing extends above the handle portion." Dkt. No. 119-3 at 60-62.

The stringency of OBP's proposed construction, however, does not draw support from the specification. Under OBP's proposal, the length of the housing would be restricted because it could not extend beyond the curved portion.

I note that during the course of the claim construction phase of the case, Welch Allyn's position has evolved to now request that the court affirmatively conclude that the curved portion of the speculum set forth in the various claims, including Claim 1 of the '898 Patent, need not be "perfectly smooth" but can instead be stepped. OBP objects and counters that under the '898 Patent the curved portion must be "perfectly smooth." Neither side requested clarification regarding this issue in the joint claim construction statement filed with the court. I recommend that the court decline to further construe this claim and conclude that the definition and scope of the phrase "curved portion" is sufficiently clear from the claim language to permit a jury to make a factual determination regarding infringement.

Addressing shape, Claim 1 does not directly specify the shape of the illumination assembly housing. As Welch Allyn argues, the inventors have specifically interjected shape in other claims, including Claim 16 ("the housing of the portable illumination assembly being attached to the inner surface of the curved portion of the lower blade *and shaped in accordance with the curved portion*"), Claim 19 ("in which the housing of the portable illumination assembly is attached to the inner surface of the curved portion of the lower blade *and shaped in accordance therewith*"), and Claim 23 ("wherein a proximal end of the housing is disposed along the inner surface of the curved portion and is defined by a shape that conforms with the "curved portion"). '898 Patent, 31:25-29, 31:35-38, 32:24-26 (emphasis added). This, Welch Allyn contends, demonstrates that the housing recited in Claim 1 is not limited in shape.

It is significant to note that the addition of the limitation now at issue was prompted by a suggestion by the patent examiner during an interview on May 13, 2015, as memorialized in the following memorandum excerpt:

> The differences between the prior art and the applicant's device were discussed. Suggestions were made to claim the portable illumination assembly extending along a transition between the lower blade trough and the lower blade handle to mimic the curvature of the light pipe (254, shown in Fig. 27).

Dkt. No. 119-4 at 7 (emphasis omitted). In an amendment responding to

the PTO's office action, dated May 26, 2015, the applicants added the

provision now at issue, *id.* at 12, and explained as follows:

> In addition, amended claim 1 now further recites
> that the portable illumination assembly is attached
> to the lower blade with the housing of the assembly
> extending along the inner surface of the curved
> portion.

*Id.* at 21.

Figure 27, which is included in the '898 Patent, is set forth below:



As can be seen, the light pipe **254** referenced both extends beyond the

curved portion of the lower blade and is flared to separate from the wall of

the curved portion and handle. This would seem to support Welch Allyn's

construction and to be inconsistent with OBP's limitation with regard to

both length and shape of the housing assembly.[7]

Confusion is engendered, however, by Welch Allyn's reliance upon

Fig. 23, as set forth below:



Welch Allyn focuses upon the shape of the light pipe **764** and that it flares

away from the curved portion of the inner surface of the lower blade. In

Figure 23, the housing **750** is actually located in the handle and does not

---

[7]     It must be remembered that Figure 27 depicts a light pipe that was suggested by the patent examiner only to demonstrate how a housing could "mimic" the light pipe as it followed the transitional portion of the speculum located between the lower blade trough and the lower blade handle. As OBP points out, in that figure, of necessity the light pipe flares away from the wall of the handle in order to center the lens **262** used to collect light and project it through the light pipe.

extend upward to the curved portion of the lower blade. That figure, then, is not dispositive.

The '898 Patent is unhelpful to the extent that it does not contain reference to a figure that would demonstrate the embodiment envisioned in the amendment at issue. In considering the specification, including Figures 23 and 24, I conclude that, insofar as length is concerned, a POSIA would understand that the housing specified can extend beyond the end of the curved portion of the lower blade.

The next question to be addressed is whether "extend along" means fully parallel with the curved surface. Some guidance is provided by consideration of Figure 12, which is set forth below.



FIG.12

In the description of that figure, it is stated that "according to the present embodiment, a conductive strip member **290** extends along an interior

side wall of the housing **236** (not depicted)[.]" '898 Patent, 11:53-55. It is clear from that figure that the conductive strip **290** referenced runs parallel to, and alongside, the specified interior side wall of the housing.

Having considered the matter carefully, I conclude that the phrase "extend along" is sufficiently precise to convey the intended meaning, and that further refinement is unnecessary, except to clarify that the housing can extend beyond the terminus of the curved portion of the lower blade at either end.

In sum, I find that neither of the party's proposed constructions of the term at issue is supported by the relevant intrinsic evidence. Welch Allyn would require that the housing be positioned only along a portion of the inner surface of the lower blade that is curved, while OBP's proposed construction would require the housing to be continuously in line with the inner surface. In my view, the claim term now under consideration is sufficiently clear, and a jury will be able to construe for itself understand the term "extends along." Accordingly, I recommend that the term be construed as "the housing extends along, but can extend beyond, the inner surface of the lower blade that is curved."

2.    The proximal end of the housing is disposed along the
inner surface of the curved portion of the lower blade/a
proximal end of the housing is disposed along the inner
surface of the curved portion

Relatedly, Claims 8 and 20 of the '898 Patent specify that "the

proximal end of the housing is disposed along the inner surface of the

curved portion of the lower blade." '898 Patent, 30:24-27, 31:39-41.

Similarly, Claim 23 recites "a proximal end of the housing is disposed

along the inner surface of the curved portion." *Id.* at 32:24-26. In their

submissions the parties have suggested the following constructions for

those terms:

| Welch Allyn | OBP |
|---|---|
| the proximal end of the housing is positioned along the portion of the inner surface of the lower blade that is curved downward and extends to the handle portion and that does not have to be perfectly smooth | no construction necessary |

As was previously noted, the parties appear to be in agreement that

the proximal end of the device is that which is closest to the user. In

addition, counsel for OBP has agreed at the claim construction hearing

that the terms "disposed" and "positioned" are interchangeable. The

apparent dispute with respect to this claim stems from Welch Allyn's

request for clarification over whether the curved portion of the lower blade

need be "smooth" and perfectly curved. For the reasons set forth above, I

recommend that the court decline to decide that question, and instead

construe the two-related terms in issue as "the proximal end of the

housing is positioned along the lower portion of the inner surface of the

lower blade that is the curved portion of the lower blade."

> 3.  <u>The housing of the portable illumination assembly
> being attached to the inner surface of the curved
> portion of the lower blade and shaped in
> accordance with the curved portion/the housing of
> the portable illumination assembly is attached to
> the inner surface of the curved portion of the lower
> blade and shaped in accordance therewith/defined
> by a shape that conforms with the curved portion</u>

Claims 16 and 19 of the '898 Patent limit the housing of the portable

illumination assembly to "being attached to the inner surface of the curved

portion of the lower blade and shaped in accordance with the curved

portion" (Claim 16) or "attached to the inner surface of the curved portion

of the lower blade and shaped in accordance therewith" (Claim 19). '898

Patent, 31:26-29, 31:36-38. In a similar vein, Claim 23 specifies that the

housing is "defined by a shape that conforms with the curved portion." *Id.*

at 32:25-26. In their submissions the parties have submitted the following

proposed constructions for these terms:

| Welch Allyn | OBP |
|---|---|
| the housing is angled so that both ends are attached along the portion of the inner surface of the lower blade that is curved downward and extends to the handle portion and does not have to be perfectly smooth | the housing of the portable illumination assembly being attached to the inner surface of the curved portion of the lower blade and shaped to follow the shape of the curved portion |

The apparent import of the limitations described in Claims 16 and 19 above is two-fold. First, the housing of the portable illumination assembly must be attached to the inner surface of the curved portion of the lower blade. And secondly (and applicable to the term at issue in Claim 23), it must be shaped in accordance with the curved portion of the inner surface of the lower blade.

On its face, the plain language of this term does not appear to support Welch Allyn's position, which would require the housing to be angled only so that both ends are attached to the inner surface of the lower blade. This is confirmed by a submission by the inventors to the PTO dated May 26, 2015. Specifically, the inventors introduced independent Claim 15 and independent Claim 22 and stated, with respect to those two claims, as follows:

> Independent claim 15 has also been similarly amended to recite a vaginal speculum apparatus in which the lower blade has a handle portion downwardly extending from and part of the proximal end of the lower blade and a trough-

> shaped blade portion. The blade portion includes a curved portion extending to the downwardly extending handle portion in which the housing is attached to the curved portion of the lower blade and shaped in accordance with the curved portion.
>
> ***
>
> Th[e] amended claim [22] further recites that the housing of the portable illumination assembly is attached to the inner surface of the lower blade wherein the proximal end of the housing is disposed within and shaped to conform with the inner surface of the curved portion.

Dkt. No. 119-4 at 23.[8]

It is true that the fact that the '898 Patent sets forth the two requirements in the conjunctive suggests that they are independent and implies that the housing need not be attached at all points to the curved portion of the lower blade. Once again, there is little guidance provided by the specification to assist the court in construing this term. Nowhere, however, does it appear to be required that the housing be attached at all points to the curved portion of the inside of the lower blade. I do not agree with the parties, however, that "in accordance with" needs to be construed because there is no evidence that this phrase has any special meaning, and I believe it can be readily understood by a POSIA and a jury in light of

---

[8]    Independent Claims 15 and 22 as set forth in the inventors' response to the PTO have since been renumbered. Claim 15 as described above is now Claim 11, and Claim 22 as described above is now Claim 23.

its context. In addition, there is certainly no indication in the specification that "shaped in accordance with" means "angled," as suggested by Welch Allyn. OBP's suggested construction ("shaped to follow the shape"), on the other hand, introduces unnecessary ambiguity. Accordingly, I recommend that this term be construed as "the housing of the portable illumination assembly is attached to the inner surface of the curved portion of the lower blade and is shaped in accordance with the curved portion of the lower blade, but need not be attached to that curved portion at all points."

4.   Retained

Claims 1, 16, and 23, the three independent apparatus claims of the '898 Patent, all require that at least one LED and the portable power source included within the illumination assembly be "retained" within either the portable illumination assembly's common housing (Claims 1 and 23) or the portable illumination assembly's housing (Claim 16). '898 Patent, 29:51-52, 31:6-7, 32:4. In their submissions the parties have taken the following positions with respect to this term:

| Welch Allyn | OBP |
|---|---|
| no construction necessary | held in place |

The disagreement regarding this term concerns whether the LED that is being "retained" must be held in place, or instead merely located in some way, within the housing. Welch Allyn contends that the term

"retained" is commonly understood, and that a jury would have no difficulty in understanding what it means. Dkt. No. 225 at 25. Accordingly, it argues, no further refinement of the term is necessary. *Id.* Welch Allyn notes that in the context of the earlier claim construction context with respect to the '175 Patent, OBP agreed to the following construction of the term "within a common housing" that included the term "retains": "an enclosure that retains within it the components of the portable illumination assembly." *Id.*; Dkt. No. 90 at 58. According to Welch Allyn, OBP's agreement to such a construction suggests that OBP concurs that the term is sufficiently specific. Dkt. No. 125 at 25. Citing exclusively dictionary definitions, OBP counters that the term requires clarification, and that a proper construction should incorporate the concept of being fixed, or in place. Dkt. No. 120 at 22-23.

Consideration of common dictionary definitions of the word "retain" is not dispositive on this issue. It is true that one of the definitions of the verb "retain" includes "to hold (something) fixed in a place or position." *See, e.g., retain, v.*, Oxford English Dictionary, http://www.oed.com/view/Entry/164150?rskey=uIufXf&result=2#eid (last visited June 14, 2017. The term can also, however, be defined as "[t]o restrain; to hold back, check, or stop[.]" *Id.*; *see also Merriam-Webster's*

*Collegiate Dictionary* ("*Merriam-Webster's*") 999 (Frederick C. Mish, *et al.*, eds.) 10th ed. 1999 (defining "retain" to mean "to hold back, keep, restrain").

The specification of the '898 Patent provides little enlightenment concerning the intended use by the inventors of the term "retained." The terms "contained" and "retained" appear throughout the specification. Many references are made to something "contained" within the housing or light assembly, or within some other element. *See e.g.*, '898 Patent, 2:56-58 ("According to at least one version, the portable illumination assembly can include means for energizing the at least one LED **contained** within the housing."); *id.* at 3:38-41 ("said apparatus comprising a portable illumination assembly comprising a portable power source and at least one LED **contained** within a common housing"); *id.* at 7:53-57 ("The switch assembly **160** is defined by an elastomeric housing, having a depressible button **163** that is used to selectively energize the miniature incandescent lamp . . . **contained** within the distal portion **148** of the illuminator housing **144**."); *id.* at 13:20-25 ("[T]he corded illumination assembly **140** and the cordless or portable illumination assembly **230** can be installed into the receiving cavity **217** of the handle portion **216** in which the light source **contained** in each assembly is effectively coupled with the proximal end

of a light pipe **254**, FIG. **27**, to uniformly illuminate the target."); *id.* at

16:40-45 ("The sheath member **266** according to this embodiment need

only conform to the base portion **260** since the remainder of the

illumination assembly **230** is **contained** within the receiving cavity **217**,

wherein the sheath can be removed for disposal using a tab **268** that

permits tearing of a disposed frangible tear strip **270**."); *see also id.* at

3:14-16 ("The power adapter can **contain** either a primary or auxiliary

power supply, depending on the application.");

The term "retained" or one of its derivatives also appears at various

points within the specification. *See, e.g.*, '898 Patent, 3:8-11 ("At least one

of the illumination assemblies can be powered by at least one battery,

either **retained** directly within an assembly housing or alternatively by way

of a connected component, such as by means of an attached power

adapter."); *id.* at 4:23-28 ("The illumination assembly can be **retained** by

at least one engagement/retention feature provided within the receiving

cavity, such as grooves, channels, ribs and the like, wherein the at

least one engagement/retention feature can also co-act to permit

specific alignment of the illumination assembly relative to the receiving

cavity."); *id.* at 4:56-59 ("According to one version, a receiving cavity of

the speculum includes features to permit the illumination assembly to

be **retained** by the speculum, such as ribs, protrusions or grooves.");
*id.* at 10:6-7 ("An upper portion of the light source is also **retained** within
the spacer tube **241**."); *id.* at 10:23-27 ("A lower portion of the LED **232** is
**retained** within a heat sink **244** made from a heat conductive material,
such as, for example, aluminum, into which the lower end of the spacer
tube **241** extends, as well as the extending electrical contact wires . . .
from the LED **232**."); *id.* at 10:37-43 ("The upper end of the battery **242**
is **retained**, according to this embodiment, against a portion of an inner
wall defining the inner walled cavity **276,** the latter being defined to
receive a spring loaded plunger **284** beneath the heat sink **244**, the
plunger being aligned for movement in a direction that is perpendicular
to the primary axis of the illumination assembly **230**."); *id.* at 10:51-57
("According to this embodiment, the circuit board **240** is **retained** and
aligned within the housing **236** using a set of guide rails **285**, though
other suitable retaining means can be used. A set of charging contacts
**286** are disposed immediately beneath the circuit board **240**, each
projecting through a bottom surface **287** of the housing **236**."); *id.* at
15:16-22 ("In this version as well as the preceding embodiment, the
handle portion **216**, FIG. **5**, **216**A, FIG. **14**, can further include a series
of parallel vertically arranged ribs **256**, FIG. **7**, disposed on a front

facing side thereof, the ribs providing a means for dissipating heat developed by the **retained** illumination assembly, as well as providing a means for keeping a user's fingers away from 'hot' surfaces."); *id.* at 19:57-58 ("Referring to FIGS. **18** and **19**, the miniature LED **1272** is **retained** within a cartridge **1276**."); *id.* at 19:63-65 ("The battery **1280** is **retained** by a spring **1288** disposed at the lower or negative end of the battery, the casing having an end cap **1292** for releasably **retaining** the above components."); *id.* at 20:23-29 ("The PCB **1314** according to this embodiment, is disposed immediately below or proximal to the miniature LED **1272**, and includes an opening **1322** for receiving the projecting portion **1326** of a heat sink **1330**, **retained** by the housing body **1304** in order to dissipate heat that is generated by the miniature LED **1272**, as well as heat also generated by the PCB **1314**."); *id.* at 20:37-40 ("A second electrical contact **1331** is formed from a lead wire that extends axially from a battery contact board **1335**, the board being **retained** within the bottom of the cartridge body **1304**."); *see also id.* at 9:42-45 ("In brief, this illumination assembly **230** is defined by a housing **236** having a substantially hollow interior that is sized to **retain** a number of components[.]"); *id.* at 9:63-64 ("As noted, the substantially hollow interior of the housing **236** is sized to **retain** a number of components.");

*id.* at 11:2-8 ("Details relating to the attachment of a housing of an illumination assembly is described in a subsequent embodiment, but for purposes of this discussion and referring back to FIGS. **11** and **12**, the charging contacts **286** are engaged when the base portion **260** of the housing **236** is placed within a port of the docking station, the port being configured to **retain** same."); *id.* at 15:12-16 ("According to this version, a set of rails **250**A are sized to separately accommodate the corded illumination housing, wherein the rails align the assembly as well as **retain** the assembly in the receiving cavity **217**A."); *id.* at 20:30-32 ("The heat sink **1330** includes an axial groove **1327** extending over the entire axial length thereof and is sized to **retain** one of a pair of electrical contacts."); *id.* at  23:46-50 ("The assembly **604** is defined by a compact housing **640** sized to **retain** a miniature light source, such as at least one LED, as well as batteries separately provided in spaced depending leg portions **644**, **648** of the housing."); *id.* at 24:28-33 ("In this embodiment, the portable illumination assembly **704** comprises a compact housing **750** that **retains** a miniature light source **754**, such as at least one white or other color LED, . . . as well as a portable power supply and resident circuitry for powering the contained LED.").

Several of the specification excerpts set forth above that utilize the terms "retain" or "retained" also make reference to the means through which retention occurs. In my view, this suggests that the inventors contemplated something more than merely "contained" when using the term "retained" or "retains" and intended to encompass the concept of being in some way affixed when using the term "retain" or a derivative. Given the lack of meaningful direct guidance provided by the specification, and having considered these additional excerpts, I recommend that the court construe this term to mean "held in place" as suggested by OBP.

        5.    <u>A switch disposed on the exterior of the housing</u>

Claim 3 of the '898 Patent specifies that the "mechanism for selectively energizing the at least one LED comprises a switch disposed on the exterior of the housing." '898 Patent, 30:3-5.

The parties' dispute with respect to this term raises two issues. The first concerns whether the switch must be located entirely outside of the housing, and the second is whether the switch must be attached to the exterior of the housing, or rather simply located there so as to provide a means of accessing it from outside the housing. The parties have offered the following proposed constructions for this term:

| Welch Allyn | OBP |
|---|---|
| at least a portion of the switch is positioned outside of the housing | the switch is placed on the outer surface of the housing |

The specification supports Welch Allyn's contention regarding whether the switch must be wholly or only partly disposed on the outside of the housing. Summarizing the invention, it states the following:

> According to at least one version, the portable illumination assembly can include means for energizing the at least one LED contained within the housing.

> The LED energizing means *can be* disposed on the exterior of the housing of the portable illumination assembly. According to one version, a switch mechanism can include a mechanical switch member, *having a portion that is provided on the exterior of the housing,* in which the switch member is biased in an off position.

'898 Patent, 2:59-64 (emphasis added). Moreover, this is a sensible conclusion. As Welch Allyn argues, it is necessary for the switch to connect with the electrical components inside the housing to serve its purpose.

Welch Allyn acknowledges that, in keeping with the intent of the '898 Patent invention – eliminating a tethered light source and replacing it with a self-contained portable light assembly – the switch should both be accessible from the outside of the housing and affixed in some way to the

housing. Where the parties part ways is whether or not the switch needs to be affixed to the outside of the housing.

I agree with OBP that the ordinary meaning of the phrase "disposed on" requires the switch to be attached, in some manner, to the exterior of the housing. The ordinary definition of "dispose" includes "to place (things) at proper distances apart and in proper positions with regard to each other, to place suitably." *Dispose, v.*, Oxford English Dictionary, http://www.oed.com/view/Entry/55113?rskey=WNMnHc&result=2&isAdvanced=false#eid (last visited June 16, 2017); *see also Merriam-Webster's* 335 (Frederick C. Mish, *et al.*, eds.) 10th ed. 1999 (defining "dispose" to mean "to put in place"). The ordinary definition of the preposition "on" includes "[i]n contact with, upon the surface of." *On, prep.*, Oxford English Dictionary, http://www.oed.com/view/Entry/131297?rskey=rEwFvc&result=5&isAdvanced=false#eid (last visited June 16, 2017); *see also Merriam-Webster's* 811 (Frederick C. Mish, *et al.*, eds.) 10th ed. 1999 (defining "on" to mean "used as a function word to indicate position in contact with and supported by the top surface of" and "used as a function word to indicate position in or in contact with an outer surface"). Accordingly, taken together, and without consideration of the specification of the '898 Patent, the ordinary

definition of "disposed on" means "placed in contact with." Having reviewed the '898 Patent specification, I cannot find any evidence to suggest that the inventors intended to ascribe a different meaning to the phrase "disposed on" other than its ordinary definition.

Welch Allyn contends that the ordinary usage of that phrase unfairly narrows the claim term because it does not account for the purpose of the invention – namely, that the illumination assembly be self-contained. In taking this position, Welch Allyn hypothesizes that a switch that is affixed to the interior of the housing that extends to the exterior of the housing satisfies the claim term at issue, notwithstanding that it is not affixed to the exterior of the housing. The problem with this hypothesis, however, is that there is no intrinsic support for it, and there is otherwise no evidence that the inventors intended to provide for such a switch.

I am persuaded that the ordinary definition of the term "disposed on" should reign in this instance in light of the absence of any specification language that suggests otherwise. Accordingly, I recommend that the term at issue be construed as "at least a portion of the switch is placed in contact with the exterior of the housing."

6.    At least one of the speculum and the
illumination assembly is configured for at least one
of single use or single patient use

Claim 6 of the '898 Patent specifies the system recited in Claim 1,

adding the additional limitation that is the subject of this particular request

for guidance. In their submissions the parties have counter-proposed the

following constructions for this term:

| Welch Allyn | OBP |
|---|---|
| the speculum, the illumination assembly, or both, are designed to be discarded after a single use or a single patient use | indefinite<br><br>OR<br><br>if it is not indefinite, then no construction is necessary |

Turning first to OBP's indefiniteness argument, it maintains that the

vaginal speculum and portable illumination assemblies specified in Claim

1 can always be configured for single patient use. Dkt. No. 120 at 25. OBP

argues that Claim 6 does not add any specific structure or feature relevant

to transforming either or both into a single-patient-use device and that, as

a system claim, rather than a method or use claim, it is indefinite. *Id.*

As is relevant here, 35 U.S.C. § 112(b) requires that a patent's

specification "shall conclude with one or more claims particularly pointing

out and distinctly claiming the subject matter which the inventor or a joint

inventor regards as the invention." 35 U.S.C. § 112(b); *Nautilus, Inc. v.*

45

*Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2125 (2014). "A lack of definiteness renders invalid the patent or any claim in suit." *Nautilus, Inc.*, 134 S. Ct. at 2125 (quotation marks omitted).

It is not clear whether a court should address indefiniteness during claim construction proceedings or later, either at the summary judgment stage or during a trial. Adding to the confusion, the Federal Circuit has suggested that indefiniteness is a matter that "go[es] to claim *validity,*" *Intervet Am., Inc. v. Kee-Vet Labs.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (emphasis in original), yet is also "inextricably intertwined with claim construction[.]" *Amtel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999); *see also S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) ("The question of whether the claims meet the statutory requirements of § 112[(b)] is a matter of construction of the claims, and receives plenary review on appeal."); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."). These cases, and the absence of explicit guidance from either the Supreme Court or Federal Circuit, have engendered confusion regarding whether a district court should address indefiniteness at the time

it conducts its claim construction analysis, or whether it should do so at a later procedural stage. *See, e.g., Indus. Tech. Research Inst. v. LG Elecs. Inc.*, No. 13-CV-2016, 2014 WL 6907449, at *2 (S.D. Cal. Dec. 8, 2014) ("To begin with, the Court recognizes the uncertainty that exists as to whether indefiniteness should be addressed during claim construction proceedings or the summary judgment stage."); *ASM Am., Inc. v. Genus, Inc.*, No. 01-CV-2190, 2002 WL 1892200, at *15-16 (N.D. Cal. Aug. 15, 2002) ("There is some ambiguity in the case law as to whether a finding of indefiniteness should occur during claim construction, or whether it should occur at a later step."). Adding to the confusion is the fact that, in two of the instances where the Federal Circuit has suggested that indefiniteness is appropriately addressed during claim construction, the court was reviewing a district court's decision on summary judgment. *Amtel Corp.*, 198 F.3d at 1375-76; *S3 Inc.*, 259 F.3d 1365. That guidance, without further explanation, seems misplaced in the context of an appeal from a district court's summary judgment decision.

In any event, without deciding which is the better course as a general principle, I recommend that the court defer addressing OBP's arguments regarding indefiniteness. Although a court may be forced to engage in an indefiniteness analysis at the claim construction phase when

"reasonable efforts at claim construction prove futile," *Inova Diagnostics, Inc. v. Euro-Diagnostica AB*, No. 08-CV-0845, 2009 WL 2602608, at *4 (S.D. Cal. Aug. 24, 2009) (quotation marks omitted), those circumstances are not present here.[9] Accordingly, I recommend that the court decline OPB's invitation in this case to determine at this juncture whether the disputed claim term from Claim 6 is indefinite under section 112 and leave that issue for resolution at a later stage in the proceedings.

The issue of disposability was addressed during the earlier claim construction context addressing the '175 Patent. Two of the claims in that patent disclose devices in which the speculum recited is disposable, and two additional claims provide that the entire apparatus referenced in the claims is disposable. Dkt. No. 90 at 43. In the court's claim construction decision regarding the '175 Patent, it was determined that a POSIA would construe the claim to mean that the speculum/entire apparatus is designed to be discarded after a single use or a single patient use. *Id.* at 46.

Welch Allyn argues that Claim 6 of the '898 Patent incorporates this concept of a speculum, illumination assembly, or both designed to be

---

[9]     Of course, that a disputed term is merely amenable to construction does not necessarily render the limitations valid under section 112. *See Nautilus, Inc.*, 134 S. Ct. at 2130 ("It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims.").

disposed of after a single use or single patient use. As Welch Allyn

asserts, disposability is at the forefront of the specification of the '898

Patent. A portion of the specification, describing the field of the disclosure,

states as follows:

> This application generally relates to the field of
> hand-held medical diagnostic instruments, and
> more particularly to a vaginal speculum apparatus
> including a single-use or single-patient speculum
> that distributes illumination from at least one
> illumination assembly attached to the speculum.

'898 Patent, 1:20-24. At various points further on the specification, the

concept of disposability is again discussed. *See, e.g.*, *id.* at 3:34-36 ("In

one version, the speculum is disposable and the portable illumination

assembly is reusable. Alternatively, the entire apparatus can be

disposable."). The specification elsewhere similarly provides that,

"[a]ccording to one version, the speculum is disposable, [sic] Alternatively,

the entire apparatus, including the illumination assembly, is disposable."

*Id.* at 4:35-37.

Having carefully considered the matter, I conclude that the proposed

construction propounded by Welch Allyn is both supported by the claim

terms themselves and the specification of the '898 Patent, and consistent

with the construction given to a separate but related term found in the '175

Patent. Accordingly, I recommend that this term be construed to mean "the

speculum, the illumination assembly, or both, are designed to be

discarded after a single use or a single patient use."

### 7.    Circuitry

Claim 7 of the '898 Patent, which is dependent upon Claim 1, adds

the limitation "circuitry enabling the at least one LED to be energized by

the portable power source." '898 Patent, 30:20-22. In their submissions

the parties have counter-proposed the following constructions for this final

term:

| Welch Allyn | OBP |
|---|---|
| two or more components that allow electricity to flow | a system of conductors through which an electric current can flow that enables the LED to be energized by the portable power source[10] |

The second portion of the proposed OBP construction, if adopted,

could create a redundancy because the claim already includes the

---

[10]    OBP originally argued that the term "circuitry enabling the at least one LED to
energized by the portable power source" is a means-plus-function term subject to
construction under 35 U.S.C. § 112(f), offering the following proposed meaning:

> [A] buck-boost constant current LED driver for controlling
> the current required by the LEDs, a circuit having at least an
> input voltage, a driving transistor for causing current to flow
> through an inductor for storing energy and a diode for
> driving current into the LED, and equivalents of the
> foregoing under Section § [sic] 112(f).

Dkt. No. 115 at 15. OBP has since withdrawn this proposed alternative construction.
Dkt. No. 120 at 26.

concept of enabling the LED to be energized by the portable power source, and is therefore unnecessary. *See, e.g., Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (finding that the district court erred in construing term claim in such a manner that rendered the claim's language superfluous). Sensing that with the elimination of that phrase the parties' constructions did not dramatically differ, during the claim construction hearing I offered a proposed construction of the term "circuitry" to mean "two or more components through which an electric current can flow." Based upon the parties' agreement that this is an acceptable construction of the term, I will include it in my recommendation.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Based upon the parties' oral and written presentations, and having carefully considered the available intrinsic evidence and, to the extent necessary, extrinsic evidence, it is hereby respectfully

RECOMMENDED that the court adopt the following constructions of the claim terms at issue in this matter:

| Term | Construction |
|---|---|
| illumination assembly | a self-contained illumination assembly that can be easily moved from place-to-place |
| mechanism for energizing/mechanism for selectively energizing | a slider switch with a conductive strip; a rotory switch with a conductive strip; an optical switch; a magnetic/reed switch; an ON/OFF throw switch that can be enabled with the speculum when engaged therewith to automatically or manually energize and de-energize the LED; and equivalents of the foregoing switches |
| the housing extends along the inner surface of the curved portion of the lower blade | the housing extends along, but can extend beyond, the inner surface of the lower blade that is curved |
| the proximal end of the housing is disposed along the inner surface of the curved portion of the lower blade/a proximal end of the housing is disposed along the inner | the proximal end of the housing is positioned along the lower portion of the inner surface of the lower blade that is the curved portion of the lower blade |
| the housing of the portable illumination assembly being attached to the inner surface of the curved portion of the lower blade and shaped in accordance with the curved portion/the housing of the portable illumination assembly is attached to the inner surface of the curved portion of the lower blade and shaped in accordance | the housing of the portable illumination assembly is attached to the inner surface of the curved portion of the lower blade and is shaped in accordance with the curved portion of the lower blade, but need not be attached to that curved portion at all points |

| | |
|---|---|
| therewith/defined by a shape that conforms with the curved portion | |
| retained | held in place |
| a switch disposed on the exterior of the housing | at least a portion of the switch is placed in contact with the exterior of the housing |
| at least one of the speculum and the illumination assembly is configured for at least one of single use or single patient use | the speculum, the illumination assembly, or both, are designed to be discarded after a single use or a single patient use |
| circuitry | two or more components through which an electric current can flow |

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      June 23, 2017
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge